# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 01-CV-6129 (JFB) (CLP)

————————————

GREGORY MESSER, ESQ., AS TRUSTEE OF THE BANKRUPTCY ESTATE OF ANTHONY STYLIANOU, AND LINDA TIEBER,

Plaintiffs,

VERSUS

THE BOARD OF EDUCATION OF THE CITY OF NEW YORK,
JOEL I. KLEIN,
DR. SUSAN ERBER,
MARTA ROJO,
TRUSTEES OF THE TEACHERS' RETIRMENT BOARD,
THE TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK,
AND DONALD MILLER,

Defendants.

————————————

MEMORANDUM AND ORDER
January 16, 2007

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Anthony Stylianou, via Gregory Messer, Esq., as trustee of the bankruptcy estate of Anthony Stylianou, and Linda Tieber (collectively "plaintiffs"), bring the present employment discrimination action against the Board of Education of the City of New York ("BOE"), Joel I. Klein, Chancellor of the New York City Public Schools, Dr. Susan Erber ("Superintendent Erber"), individually and as Superintendent of District 75, Marta Rojo, ("Principal Rojo"), individually and as Principal of P.35M, Trustees of the Teachers' Retirement Board, the Teachers' Retirement System of the City of New York ("TRS"), Donald Miller, as Executive Director of the Teachers' Retirement System of the City of New York, and unidentified John Does 1-7 in their official capacities as Trustees of the

Teachers' Retirement Board (collectively "defendants").[1]

Presently before the Court is defendants' motion for summary judgment on all claims pursuant to Fed. R. Civ. P. 56. For the reasons that follow, defendants' motion is granted in part and denied in part.

[1] When the instant action was commenced, Anthony Stylianou was the sole plaintiff. On June 24, 2005, Magistrate Judge Cheryl L. Pollack substituted Gregory Messer, trustee of the bankruptcy estate of Mr. Stylianou, as plaintiff in the action (without objection by defendants) following the reopening of a discharged Chapter 7 bankruptcy action against Mr. Stylianou. (Bernstein Declaration [hereinafter "Bernstein Decl."], Ex. 13.) By the same order, Joel I. Klein, current Chancellor of the Board of Education of the City of New York, replaced defendant Harold O. Levy, former Chancellor of the Board. (*Id.*) Plaintiff Linda Tieber, Mr. Stylianou's domestic partner, was added as a co-plaintiff in the Second Amended Complaint. (Second Am. Compl. ¶ 8.) The Second Amended Complaint also added the Teachers' Retirement System, the trustees of the Teachers' Retirement Board and Donald Miller as defendants. (*Id.* ¶¶ 13-16.) In addition, although discovery is now complete, plaintiffs have failed to serve, or even identify, the John Does listed as defendants in the Second Amended Complaint. The Court concludes that plaintiffs were provided with ample time to attempt to identify the John Doe defendants, and therefore dismisses plaintiffs' claims against John Does 1-7 without prejudice. *See Jeanty v. Cty. of Orange*, 379 F. Supp. 2d 533, 536 n.3 (S.D.N.Y. 2005).

## I. BACKGROUND

### A. FACTS

#### 1. Plaintiff Stylianou's Employment History With the BOE

The following facts are taken from the parties' depositions, declarations, exhibits and respective Local Rule 56.1 statements of facts.[2] Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Thus, with regard to defendants' motion for summary judgment, the Court shall construe the facts in favor of plaintiffs.

Plaintiff Anthony Stylianou has been employed with the Board of Education of the City of New York for approximately twenty-eight years. (Pls.' Statement of Undisputed Facts ("Pls.' 56.1 Stmt."), ¶ 8.) In 1970, he became a school teacher, and in 1987 was licensed as a school psychologist. (Pls.' 56.1 Stmt., ¶ 8.) In September 1988, he was assigned as a school psychologist to P.35M (which was previously designated as P.58M) in District 75, the Division of Special Education. (Pls.' 56.1 Stmt., ¶ 9.) District 75 schools serve students suffering from physical, mental and emotional disabilities. (Bardavid Declaration [hereinafter "Bardavid Decl."], Ex. C.)

At some point, Mr. Stylianou informed the principal of the school, Sol Walker, that he suffered from asthma and migraine headaches. (Pls.' 56.1 Stmt., ¶ 10.) Principal Walker

[2] Where only one party's 56.1 statement is cited, the other party does not dispute the facts alleged.

permitted Mr. Stylianou to work in an air-conditioned room in order to relieve his symptoms. (*Id.*) Principal Walker's interim successor, Patricia Mulholland, permitted Mr. Stylianou to continue working in the same air-conditioned room. (Pls.' 56.1 Stmt., ¶ 11.) In or about May 1998, Marta Rojo became interim principal, and then principal, of P.35M. (Bernstein Decl., Ex. D.) Prior to joining P.35M, Principal Rojo had served as an executive assistant to the District 75 superintendent, Dr. Susan Erber, from 1996 through 1997. (*See* Bardavid Decl., Ex. D.)

In August 1998, Mr. Stylianou met with Principal Rojo to discuss accommodations for his migraine headaches and asthma. (Pls. 56.1 Stmt., ¶ 16.) During the meeting, Principal Rojo told Mr. Stylianou, "if you require an accommodation you should get yourself a job that doesn't require an accommodation." (Bardavid Decl., Ex. B.) When Mr. Stylianou disagreed with this statement, Principal Rojo responded "I would tell any person with disabilities to get themselves a job that they can do without need for any reasonable accommodation." (*Id.*) At another time, referring to a guidance counselor who had been removed from her position allegedly due to learning disabilities, Principal Rojo told Mr. Stylianou, "you're next." (*Id.*) Principal Rojo further stated that she planned to investigate Mr. Stylianou's teaching license in search of any deficiencies or problems. (*See id.*)

a. First Application for ILOD Benefits

Under BOE regulations, injury in the line of duty (hereinafter "ILOD") status permits the victim of an on-the-job injury to take leave from work with pay and without charge to sick leave. (Bardavid Decl., Ex. H.) Pursuant to the BOE's regulations as set forth in Special Circular No. 32, dated November 19, 1989, such leave will be granted if:

> (1) The principal . . . has been notified of the accident or incident and the injured employee submitted an application for injury in the line of duty leave in accordance with Section III of this Policy; and (2) [t]he Superintendent's office has determined that the causative accident or incident occurred in the line of duty; and (3) [t]he Medical Bureau has determined that unfitness for service was the direct result of the causative accident or incident.

(Bardavid Decl., Ex. H.) Special Circular No. 32 provides that an injured employee must report an injury on the job within twenty-four hours by completing a comprehensive accident report, along with an application for sick leave, Form OP 198. (*Id.*) Upon notification about an on-the-job injury, the school principal is required to submit the comprehensive accident report to the superintendent within twenty-four hours. (*Id.*) Pursuant to the regulations, the principal "shall conduct a thorough investigation and shall present as complete a record as possible to the responsible superintendent." (*Id.*) In turn, the superintendent must inform the principal of her determination of the claim within five days of receipt. (*Id.*)

On December 7, 1998, Mr. Stylianou collided with a student in the hallway of P.35M. (Bernstein Decl., Ex. 20.) The next day, he submitted an accident report to Principal Rojo stating that the student had "slammed [him] in the chest." (Bardavid Decl., Ex. E.) Following the incident, Mr. Stylianou reported to work on December 8, 9 and 10. (Pls.' 56.1 Stmt., ¶ 34; BOE and TRS

3

Defendants' Statement of Undisputed Facts ("Defs.' 56.1 Stmt."), ¶ 10.) Mr. Stylianou did not return to work on December 11, 1998, or thereafter. (Defs.' 56.1 Stmt., ¶ 10.)

On December 15, 1998, pursuant to BOE regulations, Principal Rojo obtained a witness statement from the custodian who had observed the incident involving Mr. Stylianou. (Bardavid Decl., Ex. CC.) Principal Rojo did not obtain statements from any of the other witnesses to the event, including a counselor, a school security officer, and a student. (*Id.*) According to plaintiffs, despite several requests to Principal Rojo for the proper forms to file a request for injury in the line of duty benefits (*see* Bernstein Decl., Ex. 19), she did not provide Mr. Stylianou with the requisite forms until shortly before the December holiday break. (Bardavid Decl., Exs. N, DD.) On January 12, 1999, Mr. Stylianou applied for ILOD benefits, requesting leave from work with pay and without loss of sick leave, retroactively from December 11, 1998, until February 12, 1999. (Bardavid Decl., Ex. F.)

On January 15, 1999, Principal Rojo denied Mr. Stylianou's application for ILOD benefits, noting on the application that there was a "lack of credible evidence to substantiate ILOD." (Bardavid Decl., Exs. F, MM.) She also sent a letter to Mr. Stylianou stating that his application for an ILOD had been "administratively denied." (Bardavid Decl., Ex. J.) Principal Rojo then gave the form to the school's payroll secretary, who forwarded it to the District 75 office. (Bardavid Decl., Ex. D.) At some point, Superintendent Erber noted on the application, in the box reserved for completion by a physician, that the application was "disapproved pending medical." (Bardavid Decl., Ex. K.) This notation was not one of the three determinations provided for by the BOE: (1) "approved without medical evaluation," (2) "approved subject to medical evaluation," and (3) "disapproved." (*Id.*) Superintendent Erber also added the notation "denied" on Mr. Stylianou's accompanying comprehensive accident report. (Bernstein Decl., Ex. 3.) In addition, she circled the date of the application and added an exclamation point. (*Id.*)

Generally, the BOE's Medical Bureau, which examines injured employees and makes a medical determination of whether and in what amount ILOD status should be awarded, would not have been able to conduct an evaluation of Mr. Stylianou until the administrative bar imposed by Superintendent Erber had been raised. (Bernstein Decl., Ex. 5.) On February 25, 1999, pursuant to the terms of the collective bargaining agreement between the teachers' union and the Board of Education (hereinafter, the "CBA"), Mr. Stylianou filed a "Step II grievance" requesting a lift of the administrative bar in order to proceed with a medical review by the BOE's medical bureau. (*See* Bardavid Decl., Ex. L.) A hearing officer sustained Mr. Stylianou's grievance on March 17, 1999, and the administrative bar was lifted. (Bardavid Decl., Ex. L.) The hearing officer's decision held that Mr. Stylianou's application for ILOD benefits was to be "administratively approved and forwarded to the B.O.E.'s Medical Bureau for their review." (*Id.*) On March 19, 1999, Mr. Stylianou was evaluated by the Medical Bureau for the first time.[3]

---

[3] It is unclear why the Medical Bureau examined Mr. Stylianou in March, only to conclude in May that it could not approve his ILOD request on the basis that it had already been denied administratively. According to plaintiffs, Dr. Erber delayed sending the grievance decision to

(Bardavid Decl., Ex. M.) He also submitted medical reports from his treating doctors. (*Id.*) However, on May 17, 1999, a doctor from the Medical Bureau noted on Mr. Stylianou's application for ILOD benefits that the claim had been "denied administratively."[4] (Bardavid Decl., Ex. K.)

Following this decision, the documents relating to Mr. Stylianou's ILOD benefits application, including the various notations of administrative denial, were forwarded to the BOE's Medical Bureau on June 3, 1999 with a cover letter noting that Principal Rojo had denied the application.[5] (Bardavid Decl., Ex. DD; Bernstein Decl., Ex. 4.) On June 4, Mr. Stylianou was again examined by the Medical Bureau, which deemed him "fit to work" as of June 4, 1999. (Pls.' 56.1 Stmt., ¶¶ 52, 54.) Mr. Stylianou did not return to work until September 7, 1999. (Defs.' 56.1 Stmt., ¶ 22.)

On December 2, 1999, the Medical Bureau formally denied Mr. Stylianou's application for ILOD benefits from December 11, 1998 until September 7, 1999.[6] (Defs.' 56.1 Stmt., ¶ 23.) Mr. Stylianou was not notified of the Medical Bureau's final decision denying him ILOD benefits until six months later, on May 3, 2000. (Bardavid Decl., Exs. N, S.)

b. Second Application for ILOD Benefits

From December 11, 1998 through September 6, 1999, Mr. Stylianou was on unpaid leave from his position as a school psychologist at P.35M. (Bardavid Decl., Ex. N.) When Mr. Stylianou resumed his work as a school psychologist on September 7, 1999, he was assigned (at his request) to P.169M, also a District 75 school for students with disabilities.[7] (Bardavid Decl., Ex. N.) On December 1, 1999, a student at P.169M assaulted Mr. Stylianou, who was taken by ambulance to the hospital. (Bardavid Decl., Ex. N.) Mr. Stylianou did not return to work after the incident. (Defs.' 56.1 Stmt., ¶¶ 25, 29.) The next day, Mr. Stylianou's counsel drafted an incident report and faxed it to P.169M. (Bardavid Decl., Ex. N.) According to Mr. Stylianou, Peter Dubin, principal of P.169M, and Superintendent Erber failed to sign the requisite forms,

---

[4] Mr. Stylianou notes that the Medical Bureau improperly demanded his medical records from every health provider who had treated him over the seven years prior to the December 7, 1998 injury. (Bardavid Decl., Ex. N, DD.) Mr. Stylianou nevertheless complied with the requests for records to the extent possible. (*Id.*)

[5] According to plaintiffs, the documentation provided did not include the granting of Mr. Stylianou's Step II Grievance. (Bernstein Decl., Ex. 16.)

the Medical Bureau until May 18, 1999, two months after the decision was issued; thus, the Medical Bureau was unaware that the administrative bar had been lifted when it decided to deny his case on administrative grounds. (*See* Pls.' 56.1 Stmt., ¶¶ 48, 51.) However, this does not explain why the Medical Bureau would examine Mr. Stylianou in March, if they were not aware that the bar had been lifted. Neither side has presented a plausible explanation for this series of events.

[6] Mr. Stylianou notes that the denial of his first application for ILOD benefits was issued the day after he was assaulted in a second incident on December 1, 1999. (Pls.' 56.1 Stmt., ¶ 70; Bardavid Decl., Ex. N.)

[7] Mr. Stylianou has stated that he did not feel well enough to return to work at this time, but did so because "[the BOE] told [him] they would take away [his] salary, which [he] needed, and [his] health insurance, which [he] needed." (Bardavid Decl., Ex. N.)

5

including a comprehensive accident report and an OP 198, supporting Mr. Stylianou's application for ILOD benefits based upon the incident, in a timely manner. (*Id.*) On December 8, 1999, Mr. Stylianou filed his second application for ILOD benefits, based upon the December 1 incident. (Bardavid Decl., Ex. O.) On December 10, 1999, Principal Dubin approved the application subject to a medical evaluation. (*Id.*) An accompanying comprehensive accident report was signed by Principal Dubin on December 15, 1999. The report included the notation "approved subject to medical evaluation," which was signed by Superintendent Erber. (Bardavid Decl., Ex. P.) On September 13, 2000, the medical bureau issued a decision awarding Mr. Stylianou ILOD benefits for six weeks, from December 8, 1999 through January 19, 2000. (Bardavid Decl., Ex. Q.) Mr. Stylianou objected to the decision on the basis that he had not been awarded ILOD benefits for his absence from work subsequent to January 19. (Bardavid Decl., Ex. T.)

### c. Medical Arbitration of ILOD Applications

Pursuant to the terms of the CBA, on May 9, 2000 and September 19, 2000, Mr. Stylianou requested medical arbitration of the denial and partial denial of his two applications for ILOD benefits. (Bardavid Decl., Exs. S, T.) However, Mr. Stylianou refused to proceed with the medical evaluation and arbitration process, because he objected to the chosen arbitrator. (*See* Defs.' 56.1 Stmt., ¶ 38.)

### 2. COBRA Benefits

On April 26, 1999, the health insurance benefits of Mr. Stylianou and his domestic partner, Linda Tieber ("Ms. Tieber"), were terminated retroactively to February 22, 1999.[8] (Pls.' 56.1 Stmt., ¶ 55.) Plaintiffs did not learn that their benefits had been terminated until May 6, 1999, and did not receive notice pursuant to COBRA, prior to the April 26, 1999 termination of benefits.[9] (Pls.' 56.1 Stmt., ¶ 56.) In May, Mr. Stylianou and Ms. Tieber complained to the BOE, and their health insurance benefits were restored retroactive to April 26, 1999. (Defs.' 56.1 Stmt., ¶ 41.)

On June 26, 2000, while Mr. Stylianou was out of work following the second incident, plaintiffs' health insurance was terminated retroactively to February 28, 2000. (Bardavid Decl., Ex. W; Bernstein Decl., Ex. 20.) Mr. Stylianou and Ms. Tieber were not provided with COBRA notice prior to the February 28, 2000 termination of benefits. (Bardavid Decl., Ex. W; Bernstein Decl., Ex. 20.) Ms. Tieber then complained to the BOE. (Bardavid Decl., Ex. X; Ex. AA.) On May 2, 2001, the BOE offered plaintiffs the opportunity to obtain health coverage retroactive to February 28, 2000, with the requirement that plaintiffs pay the retroactive premiums. (Bardavid Decl., Ex. Y.)

---

[8] It is undisputed that plaintiff Linda Tieber is a beneficiary of Mr. Stylianou's health plan. Ms. Tieber and Mr. Stylianou have resided together since June 1992 and have been registered domestic partners since 1995. (Bernstein Decl., Ex. 16.)

[9] According to plaintiffs, following the December 7, 1998 incident, Mr. Stylianou applied for medical leave without pay on March 25, 1999, in order to maintain his health insurance. (Bardavid Decl., Ex. DD.) They allege that Principal Rojo delayed processing of the requisite forms and did not approve the leave until April 27, one day after plaintiffs' health benefits were terminated without their knowledge. (*Id.*)

Plaintiffs rejected this offer on the basis that they did not wish to pay the premiums. (*See* Bardavid Decl., Ex. W; *see also* Ex. BB.) During the period when plaintiffs were uninsured, they "delayed seeing doctors or did not see a doctor or paid out of pocket the street cost of seeing doctors and buying medications." (Bardavid Decl., Ex. W.) On May 17, 2001, the BOE permitted plaintiffs to purchase prospective COBRA benefits commencing on June 1, 2001. (Bardavid Decl., Ex. Z.) Plaintiffs elected to purchase health care coverage for an eighteen-month period commencing on June 1, 2001. (Bardavid Decl., Ex. AA.)

### 3. SSDI

On September 24, 2001, Mr. Stylianou applied for Social Security Disability Insurance Benefits ("SSDI"), alleging that he was unable to work. (Bardavid Decl., Ex. GG.) Though his application was initially denied, Mr. Stylianou sucessfully appealed the decision and the matter was remanded for further evaluation. (Bardavid Decl., Ex. HH.) After a hearing, in which Mr. Stylianou was represented by counsel, his application for SSDI benefits was granted. (*Id.*) On February 13, 2004, an Administrative Law Judge deemed Mr. Stylianou disabled as of December 11, 1998, and found him unable to perform the requirements of his past relevant work. (*Id.*)

### 4. Mr. Stylianou's Retirement From the BOE

On May 22, 2000, the BOE sent a letter to Mr. Stylianou noting that his period of coverage under ILOD benefits had expired, and requesting that he either resign, return to service, or apply for leave without pay within twenty days, or face termination for abandonment of position. (Bernstein Decl.,

Ex. 25.) In response, Mr. Stylianou submitted an application for a leave of absence "[u]nder extreme protest" on June 19, 2000. (Bernstein Decl., Ex. 26.) In November 2001, following the SSDI determination in his favor, Mr. Stylianou filed an application with the TRS for an Accident Disability Retirement Pension, claiming that he was not able to continue working as a school psychologist.[10] (Pls.' 56.1 Stmt., ¶ 80.) Mr. Stylianou was scheduled for two appointments for a medical examination by TRS. (Pls.' 56.1 Stmt., ¶¶ 81-85.) One appointment was cancelled by TRS, and the other by Mr. Stylianou. (*Id.*) According to plaintiffs, despite Mr. Stylianou's repeated attempts to schedule an examination, one was not scheduled until February 26, 2003. (Bardavid Decl., Ex. JJ.) Based upon the examination by a TRS doctor, Mr. Stylianou's application for Accident Disability Retirement was denied on March 6, 2003. (*Id.*) On March 11, 2003, Mr. Stylianou filed an application with TRS for a Service Retirement. (Pls.' 56.1 Stmt., ¶ 92.) A stipulation of the parties providing for Mr. Stylianou's Service Retirement from the BOE, retroactive to March 1, 2002, was "so ordered" by Magistrate Judge Cheryl L. Pollack on October 1, 2003. (Pls.' 56.1 Stmt., ¶ 92.)

### 5. Alleged Retaliation

Mr. Stylianou alleges that prior to December 7, 1998, he complained to the BOE that there were unsafe conditions at P.35M and that there was a pattern of inconsistent discipline of students at P.35M on the basis of race. On February 23, 1999, Mr. Stylianou wrote a letter to Superintendent Erber alleging

---

[10] TRS is a separate legal entity from the BOE. *See* New York City Admin. Code §§ 13-511, 13-512.

that he was being discriminated against on the basis of his disability. (Bardavid Decl., Ex. CC.) On July 22, 1999, Mr. Stylianou wrote to Dr. Margaret Harrington, Chief Executive of School and Support Services for the BOE. (Bardavid Decl., Ex. DD.) In the letter, Mr. Stylianou alleged that he was being discriminated against on the basis of disability and that there were unsafe conditions at P.35M. (*Id.*) On April 26, 2000, Mr. Stylianou sent a similar letter to Harold Levy, then-Interim Chancellor for the BOE. (Bardavid Decl., Ex. EE.) On May 1, 2000, Mr. Stylianou sent a second letter to Chancellor Levy, alleging the same conduct. (Bardavid Decl., Ex. FF.)

B. Procedural History

Mr. Stylianou filed the instant action on September 13, 2001, alleging the following claims: discrimination and retaliation under the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the New York State Human Rights Law, N.Y. Exec. Law §§ 292, 296, and New York City Human Rights Law, N.Y. City Admin. Code § 8-107; failure to comply with the Chancellor's Regulations; violations of due process under the United States Constitution, the New York State Constitution and New York State Education Law § 3020; violations of the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), 29 U.S.C. §§ 1161-69; and state claims of intentional infliction of emotional distress, constructive discharge and loss of consortium.

On November 10, 2006, defendants moved for summary judgment on all claims. By letter motion dated November 13, 2006 ("Pls.' Ltr. Mot."), plaintiffs cross-moved to strike certain of defendants' exhibits. Oral

argument was held before this Court on December 8, 2006. At oral argument, plaintiffs explicitly abandoned their discrimination and retaliation claims against the individual defendants. They also abandoned their claim for loss of consortium.

II. Discussion

A. Motion to Strike

Plaintiffs move to strike defendants' reply declarations (Exhibits OO and PP) as inadmissible. Plaintiffs further move to strike defendants' Exhibits I, J, L, M, Y, Z and BB as impermissible hearsay and defendants' exhibits Q and U, to the extent that they are offered for the truth of the matters asserted therein.

"The principles governing admissibility of evidence do not change on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). Accordingly, courts are free to strike or disregard inadmissible statements in parties' summary judgment submissions. *U.S. Info Sys. v. IBEW Local Union No. 3*, No. 00 Civ. 4763 (RMB), 2006 U.S. Dist. LEXIS 52870, at *13-14 (S.D.N.Y. August 1, 2006) (citing *Patterson v. County of Oneida*, 375 F.3d 206, 219, 222-23 (2d Cir. 2004)).

1. The Jacobson Declaration and Exhibit M

The party proffering evidence has the burden of showing that the prerequisites for its admissibility are met. *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994). Defendants argue that Exhibit M, a summary of the Medical Bureau's evaluations of Mr. Stylianou's ILOD claims, is not being offered for the truth of the matters asserted therein, but as evidence of the

BOE's state of mind in denying Mr. Stylianou ILOD benefits. Alternatively, defendants offer the declaration of Audrey Jacobson, School Medical Director for the BOE, to authenticate Exhibit M as a business record pursuant to Fed. R. Evid. 803(6). Plaintiffs argue that Exhibit M is not admissible under Fed. R. Evid. 803(6) because it is a summary, and was not written "at or near the time of the events described therein." (Pls.' Ltr. Mot., at 1.) Furthermore, plaintiffs argue, the exhibit was not created in the "regular course of a regularly conducted business activity," but in preparation for litigation, in the form of the medical arbitration of Mr. Stylianou's claims. (*Id.*)

Fed. R. Evid. 801 defines hearsay, which is considered inadmissible evidence under Fed. R. Evid. 802, as an out-of-court statement "offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801. Fed. R. Evid. 803(3) provides an exception to the hearsay rule, permitting admission of: "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." FED. R. EVID. 803(3); *see also Trouble v. Wet Seal*, 179 F. Supp. 2d 291, 298-99 (S.D.N.Y. 2001). According to defendants, the medical summary is being presented to show their state of mind – their belief that Mr. Stylianou was not physically eligible for ILOD benefits – rather than to prove to this Court that there was no evidence to support Mr. Stylianou's ILOD claims. To the extent that Exhibit M is offered for this purpose, there is no hearsay problem with admitting into evidence the summary of the Medical Bureau findings.[11]

  2. The Greenfield Declaration and Exhibits I, J, L, Y, Z, BB, Q and U.

Plaintiffs also move to strike Exhibits I, J, L, Y, Z, BB, Q and U as inadmissible hearsay. In response, defendants assert that all of the contested exhibits are admissible as business records.

Fed. R. Evid. 803(6) excepts from the operation of the hearsay rule, Fed. R. Evid. 802, any

> memorandum, report, record or data
> compilation, in any form, of acts [or]
> events . . . made at or near the time by,
> or from knowledge transmitted by, a
> person with knowledge, if kept in the
> course of a regularly conducted
> business activity, and if it was the
> regular practice of the business

---

[11] The Court bases its finding of admissibility solely on the "state of mind" exception to the hearsay rule, Fed. R. Evid. 803(3), rather than the "business records" exception, Fed. R. Evid. 803(6). It is well-settled that evidence "prepared or compiled for use in litigation [is] not admissible as business records." *Potamkin Cadillac Corp.*, 38 F.3d at 632; *Palmer v. Hoffman*, 318 U.S. 109, 114, 63 S. Ct. 477, 87 L. Ed. 645 (1943) (finding that documents were not business records where "it is manifest that in this case those reports are not for the systematic conduct of the enterprise as a railroad business. . . . Their primary utility is in litigating, not in railroading"). Furthermore, the Court rejects plaintiffs' contention that "defendant's state of mind is, in any event, irrelevant to any issue in this litigation." (Pls.' Reply Ltr. Br. at 1.) See *infra*, for a discussion of defendants' articulation of legitimate, non-discriminatory reasons in relation to plaintiffs' retaliation claims.

activity to make the memorandum, report, record or data compilation, . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

FED. R. EVID. 803(6). Exhibits I, J and L include: an accident report written shortly after Mr. Stylianou's December 7, 1998 incident; a letter from Principal Rojo to Mr. Stylianou notifying him that his first ILOD application was administratively denied; and a BOE Step II Grievance Memo issued by the hearing officer who granted Mr. Stylianou the opportunity to have his first ILOD claim reviewed by the Medical Bureau. These exhibits were authenticated by the Bardavid Declaration, which is not contested. Each of these exhibits were written by an individual with personal knowledge of the matters stated therein, shortly after the events took place. Each was kept in the ordinary course of business, pursuant to BOE procedures as set forth in Special Circular 32 and the CBA. The court finds that they are clearly admissible as business records.

Similarly, the Court finds that the correspondence between BOE deputy counsel and plaintiff Linda Tieber in Exhibits Y, Z and BB falls within the business records exception to the hearsay rule. Exhibits Y, Z and BB were authenticated by both the Bardavid Declaration and the Declaration of Robin Greenfield, BOE Deputy Counsel, which plaintiffs also move to strike. Plaintiffs argue that these exhibits are not admissible as business records because they were created by the BOE's attorney and contain "legal argumentation." However, this is not the case. Ms. Greenfield simply responded to Ms. Tieber's inquiries regarding plaintiffs' COBRA benefits, a task which fell to her in the ordinary course of the BOE's administrative processes. Ms. Greenfield had personal knowledge of the facts asserted therein, and wrote the letters at the time of Ms. Tieber's inquiries. There is no indication, and plaintiffs have failed to present any evidence, that the letters in question were written in preparation for litigation. *See, i.e, Palmer*, 318 U.S. at 114 (holding that records prepared for litigation are not admissible as business records). The mere fact that the letters were drafted by an attorney is insufficient to bar their admission under the business records exception to the hearsay rule.

Exhibits Q and U are form letters from Yvonne Joseph, a Medical Bureau administrator, to Mr. Stylianou regarding his second ILOD application and his request for an independent medical evaluation, respectively. As in the case of Exhibits I, J and L, they were written by an individual with personal knowledge, at the time of the relevant events, in the regular course of business, and are therefore "business records" within the meaning of Fed. R. Evid. 803(6). There is simply no basis for striking these exhibits as inadmissible hearsay.

Therefore, the Court denies plaintiffs' motion to strike Exhibit M as hearsay, on the basis that it is not being offered to prove the truth of the statements asserted therein. The Court also denies plaintiffs' motion to strike Exhibits I, J, L, Y, Z, BB, Q and U, which are admissible business records.

## B. STANDARD OF REVIEW

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere

conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

Furthermore, the Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

## C. DISCRIMINATION AND RETALIATION CLAIMS

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56 as to plaintiffs' claims of discrimination and retaliation on the basis that plaintiffs have failed to establish a *prima facie* case. In the alternative, they argue, even if plaintiffs have set forth a *prima facie* case of discrimination or retaliation, defendants have articulated legitimate, non-discriminatory reasons for their actions.

### 1. Discrimination

Plaintiffs argue that the BOE, Chancellor Joel Klein, Superintendent Erber and Principal Rojo discriminated against Mr. Stylianou in violation of federal and state law, by "denying [p]laintiff Stylianou his right to receive ILOD payment for the injuries he sustained at work, failing to ensure his pension benefits, failing to comply with its own policies and procedures, engaging in harassing conduct against [p]laintiff Stylianou on the basis of his disabilities and by terminating [p]laintiff Stylianou's health insurance without notice . . . and by failing to ensure that its methods of administration do not have the effect of discriminating against employees with disabilities." (Second Amd. Compl., ¶ 107.) Defendants contend that plaintiffs have failed to set forth a *prima facie* case of discrimination under the disability statutes, as Mr. Stylianou was not, in fact, a "qualified individual" at the time of the alleged adverse employment actions.

The ADA prohibits discrimination against "any qualified individual with a disability because of the disability of such individual in regard to [employment]." 42 U.S.C. § 12112(a). Claims of employment discrimination under the ADA are evaluated under the three-part burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[12] "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse employment action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program*, 198 F.3d 68, 72 (2d Cir. 1999)). In order to establish a *prima facie* case of discrimination, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998). Defendants do not contest that they are subject to the ADA, nor that Mr. Stylianou was disabled under the ADA from December 7, 1998 onward. Rather, they argue that Mr. Stylianou has failed to establish

---

[12] The standards for evaluating plaintiffs' claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, are the same as those applied to ADA claims. 29 U.S.C. § 791(g) ("The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 .").

the third element of a *prima facie* case, because he was not "otherwise qualified to perform the essential functions" of his position.

The ADA defines a "qualified individual with a disability" as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Shannon*, 332 F.3d at 99-100 ("[A]n individual is otherwise qualified for a job if she is able to perform the essential functions of that job, either with or without a reasonable accommodation.") (citations omitted). "Essential functions" are defined as the "fundamental" duties to be performed in the position in question. *Shannon*, 332 F.3d at 100; *see also* 29 C.F.R. § 1630.2(n)(1). In this case, it is apparent that the plaintiff was unable to perform the essential functions of his position, with or without reasonable accommodation, after he sustained injuries on the job. Following the two incidents that took place on December 7, 1998 and December 1, 1999, Mr. Stylianou requested ILOD benefits on the basis that he was physically unable to work due to his injuries. Furthermore, on September 27, 2001, Mr. Stylianou applied for SSDI benefits, claiming that he had been "unable to work because of [his] disabling condition" as of December 7, 1998. On July 8, 2005, an Administrative Law Judge awarded SSDI benefits to Mr. Stylianou retroactive to December 11, 1998, declaring that "the claimant's allegations concerning his inability to work are credible" and "the claimant is unable to perform the requirements of his past relevant work," notwithstanding the brief period from September 7, 1999 to December 1, 1999, during which Mr. Stylianou returned to work.

The record clearly indicates that, by Mr. Stylianou's own admission, he was unable to perform the essential functions of his position as a school psychologist after December 11, 1998.[13] Plaintiffs' argument that Mr. Stylianou fully performed all essential functions of his job for twenty-eight years prior to his injury is unavailing with regard to analysis of the alleged adverse actions against him after December 11, 1998. The fact that Mr. Stylianou was able to perform his job in the past is insufficient to satisfy the "otherwise qualified" requirement of a *prima facie* case of discrimination. Whether the employee is "otherwise qualified" as of the date of an adverse action is *forward-looking* and enables the employer to consider how the employee will perform as compared to non-disabled individuals. *Teahan v. Metro-N. Commuter R.R.*, 951 F.2d 511, 521 (2d Cir. 1991); *Shannon*, 332 F.3d at 100 (holding that where bus driver had passed vision tests in the past, but was later found to be color-blind, he was not "otherwise qualified" to perform the essential functions of his job at the time of termination). "[T]he 'otherwise qualified' inquiry asks whether the plaintiff *will* be able to do the job." *Shannon*, 332 F.3d at 100 (emphasis added). As Mr. Stylianou has been unable to perform his job since his December 1998 injury, he cannot set forth a *prima facie* case of discrimination under the ADA or the Rehabilitation Act.

The Court finds that plaintiffs' claims under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") are likewise without merit. The Second Circuit has held that Section 292(21) of the NYSHRL and the

---

[13] Plaintiffs conceded at oral argument that Mr. Stylianou has been unable to work since December 11, 1998.

analogous provision of the NYCHRL are parallel to the ADA with regard to the "otherwise qualified" requirement.[14] *Shannon*, 332 F.3d at 103-04 (citing N.Y. Exec. Law § 292(21); N.Y.C. Admin. Code § 8-107(15)(a)). In order to make a valid claim under the NYSHRL, Mr. Stylianou must show that his disability did "not prevent" him "from performing in a reasonable manner the activities involved in the job or occupation sought or held." N.Y. Exec. Law § 292(21); *DiSanto v. McGraw-Hill, Inc.*, 220 F.3d 61, 64 (2d Cir. 2000) ("[I]n order to prevail on the NYHRL claim, [plaintiff] was required to prove that he could perform his job in a reasonable manner."). Likewise, to prevail on his NYCHRL claim, Mr. Stylianou must show that he would have "been able to, with reasonable accommodation, satisfy the essential requisites of the job." *Shannon*, 332 F.3d at 103. Since Mr. Stylianou has been unable to work at all since December 11, 1998, he cannot prevail on his claims under the NYSHRL or under the NYCHRL.

---

[14] Under New York law, the definition of "disability" under the New York State Human Rights Law is broader than under the ADA. *See State Div. of Human Rights v. Xerox Corp.*, 65 N.Y. 2d 213, 218-19 (N.Y. 1985); *Reeves v. Johnson Controls World Svcs., Inc.*, 140 F.2d 144, 155 (2d Cir. 1998) ("Regardless of the [fact that the] legislative history of the [NYSHRL] . . . indicates that the statutory definition of disability was intended to be coextensive with that of the federal disability statutes, we are bound by the construction of the statute propounded by the state's highest court."). However, this does not affect our analysis of plaintiffs' claims of discrimination under these statutes; regardless of how disability is defined, plaintiffs cannot demonstrate that Mr. Stylianou was able to perform the requirements of his job, with or without accommodation, at the time of the alleged adverse employment actions.

Therefore, the Court grants defendants' motion for summary judgment as to plaintiffs' claims of discrimination under the ADA, Section 504 of the Rehabilitation Act, NYSHRL and NYCHRL.

### 2. Retaliation

#### a. *Prima Facie* Case

Plaintiffs allege that the BOE, Joel I. Klein, Superintendent Erber and Principal Rojo retaliated against Mr. Stylianou in violation of federal and state law. According to plaintiffs, these defendants retaliated against Mr. Stylianou by "twice terminating his health insurance retroactively and without notice and without cause, collaborating with the Medical Bureau to prevent [p]laintiff Stylianou from obtaining ILOD status, and making discriminatory and hostile remarks to [p]laintiff Stylianou regarding his disability." (Second Am. Compl. ¶ 115.) The ADA prohibits an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 122039(a). Likewise, Section 504 of the Rehabilitation Act, the NYHRL and the NYCHRL contain similar provisions prohibiting retaliation. 29 U.S.C. § 794; N.Y. Exec. Law § 296(7); N.Y.C. Admin. Code § 8-107(7). Retaliation claims brought under these statutes are evaluated under the same standards as those brought under the ADA. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citing *Weixel v. Board of Educ. of the City of New York*, 287 F.3d 138, 148-49 (2d Cir. 2002) (elements of a retaliation claim under the Rehabilitation Act are the same as under

the ADA)); *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (applying ADA analysis to plaintiff's retaliation claims under the ADA, NYHRL and NYCHRL)).

As in the case of discrimination claims, a claim of retaliation is analyzed under the three-step burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp.* 411 U.S. at 802-05; *Treglia*, 313 F.3d at 719 (citing *Weixel*, 287 F.3d at 148; *Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) ("We analyze a retaliation claim under the ADA using the same framework employed in Title VII cases.")). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate by a preponderance of the evidence that: (1) he engaged in an activity protected by the ADA; (2) the employer was aware of his activity; (3) the employer took adverse action against him; and (4) a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action. *Sista*, 445 F.3d at 177; *see also Treglia*, 313 F.3d at 719. The burden of proof that must be met to survive a summary judgment motion at the *prima facie* stage is *de minimis*. *Treglia*, 313 F.3d at 719 (citation omitted); *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (citing *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005) (internal citation omitted)). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173. Once a plaintiff has set forth a *prima facie* case, the burden shifts to defendants to show that they had a legitimate, non-

discriminatory reason for the adverse employment action. *Sista*, 445 F.3d at 169. If such a showing is made, the burden shifts back to plaintiffs to prove that the proffered reason is merely a pretext for unlawful discrimination. *Id.*

Plaintiffs assert that Mr. Stylianou engaged in protected activity by writing several letters to the BOE complaining that he had been subjected to disability discrimination, that unsafe conditions were present at P.35M and that Principal Rojo had engaged in racially discriminatory acts.[15] A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not, in fact, unlawful, "so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Treglia*, 313 F.3d. at 719 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)). Defendants do not dispute the reasonableness of Mr. Stylianou's belief that Dr. Erber and

---

[15] Mr. Stylianou's complaints about racial discrimination by Principal Rojo do not constitute "protected activity" with respect to his disability retaliation claims. *See* 42 U.S.C. §§ 12101-12213. Such complaints may, in fact, form a basis for a valid retaliation claim under Title VII. *See, e.g., Kauffman v. Maxim Healthcare Servs.*, 04-CV-2869 (TCP), 2006 U.S. Dist. LEXIS 47514, *12 (E.D.N.Y. July 13, 2006) (collecting cases and recognizing male, non-minority plaintiff's right under Title VII "to assert claims of retaliation and discrimination on account of his claimed opposition to Defendant's alleged policy against the hiring of non-whites and women"). However, Mr. Stylianou cannot establish a causal nexus between his protected acts of complaining of racial discrimination and the adverse employment actions against him, all of which relate to disability.

Principal Rojo's actions were unlawful. Nor do they contest that plaintiffs have set forth elements (1) and (2) of a *prima facie* case of retaliation. Thus, to determine whether plaintiffs have made a *prima facie* case of retaliation, the Court must evaluate factors (3) and (4): whether the BOE took adverse actions against Mr. Stylianou, and whether a causal connection has been shown between the protected activity and the alleged adverse employment actions.

### (i) Adverse Action

Defendants argue that in the case of the first termination of plaintiffs' health benefits, there was no adverse employment action because the benefits were reinstated shortly thereafter. The Supreme Court recently stated in *Burlington Northern & Santa Fe Ry. v. White* that an "adverse employment action" is one which "a reasonable employee would have found [to be] materially adverse" and which would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." 126 S. Ct. 2405, 2415 (2006). The Court also held that an employer's actions need not affect the actual terms and conditions of employment in order to constitute unlawful retaliation. *Id.*, at 2411-14; *Benson v. N.Y. City Bd. Of Educ.*, No. 02 Civ. 4756 (NGG), 2006 U.S. Dist. LEXIS 73295, *18 (E.D.N.Y. September 29, 2006). Termination of health benefits would ordinarily qualify as an "adverse employment action." *See, e.g., Cohen v. S.U.P.A., Inc.*, 814 Supp. 251, 261 (N.D.N.Y. 1993) (holding that, under the Age Discrimination in Employment Act of 1976, 29 U.S.C. §§ 621-634, "plaintiff's allegation that his benefits were terminated in retaliation for filing a complaint with the EEOC states a cognizable cause of action"). However, in the instant case, plaintiffs' COBRA health benefits were reinstated shortly after they complained, retroactive to the benefit termination date. Because plaintiffs were not actually denied health care coverage during the relevant time period, they are unable to demonstrate that the first health benefit termination constituted a materially adverse employment action. *See Burlington*, 126 S. Ct. at 2414 (holding that anti-retaliation provisions protect individuals "not from *all* retaliation, but from retaliation *that produces an injury or harm*") (emphasis added). Therefore, plaintiffs have not established a *prima facie* case of retaliation with regard to the first termination of their COBRA health benefits. Defendants do not contest that the other acts upon which plaintiffs' retaliation claims are based constitute adverse employment actions.

### (ii) Causal Connection

It is well settled that if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause, the law is violated. *Sumner v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990) (citing *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir. 1986); *DeCintio*, 821 F.2d 111, 116 n.8 (2d Cir. 1987)). Likewise, if the employer was at all motivated by retaliatory animus, the law is violated even if there were objectively valid grounds for the adverse employment action. *Id.* at 209. A plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence. *Id.*

Verbal comments may constitute direct evidence of discrimination when made by a decision-maker in the adverse employment action, and where there is a close nexus between the comments and the action. *Rose v.*

*N.Y. City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (finding discriminatory motive where comments were made to plaintiff "on more than one occasion by her immediate supervisor, who had enormous influence in the decision-making process"); *Howe v. Town of Hempstead*, No. 04 Civ. 0656 (DRH), 2006 U.S. Dist. LEXIS 78927, at *22 (E.D.N.Y. October 30, 2006) ("[Discriminatory] comments may constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the adverse employment action.") (citing *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004) ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff.")). However, such comments must be distinguished from mere "'stray remarks,' which, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998). The court must evaluate discriminatory comments in light of all of the evidence presented of discriminatory motive. While "[stray remarks], without more, cannot get a discrimination suit to a jury . . . [w]hen, however . . . other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance."[16] *Danzer v. Norden*

Sys., 151 F.3d 50, 56 (2d Cir. 1998); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 458 (2d Cir. 2001).

Where there is no direct evidence of retaliatory animus or a showing of disparate treatment of fellow employees who engaged in the same conduct, proof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by discriminatory treatment. *Gordon v. N. Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Cifra v. GE*, 252 F.3d 205, 217 (2d Cir. 1991) ("[T]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal citation omitted)); *Sumner,*

---

[16] Defendants cite to *Ahmad v. Nassau Health Care Corp.*, 234 F. Supp. 2d 185, 193 (E.D.N.Y. 2002), *aff'd*, 71 Fed. Appx. 98, 2003 U.S. App. LEXIS 16860 (2d Cir. N.Y. August 14, 2003), for the proposition that in order to determine whether Principal Rojo's comments constitute evidence of discriminatory motive, we must apply a four-part

test. (Defs.' Br. at 10.) However, there is no Second Circuit decision mandating such a formula. *See, e.g., Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162-63 (2d Cir. 2001) (finding that comments were motivated by discriminatory animus when made by a supervisor who had a significant influence on the decision to demote plaintiff); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) (rejecting district court's characterization of comments as "stray remarks" and holding that plaintiff "made out her prima facie case by offering evidence of discriminatory comments, which can constitute 'direct evidence,' and are adequate to make out a prima facie case"). In any case, were we to apply the test set forth in *Ahmad*, the Court finds that Principal Rojo's comments were (1) related to disability, (2) proximate in time to the adverse employment decision to deny Mr. Stylianou ILOD benefits, (3) made by an individual with authority over the employment decision at issue (*see* discussion, *infra*), and (4) related to the issue of whether Mr. Stylianou was entitled to receive benefits due to his physical inability to work. *Ahmad*, 234 F. Supp. 2d at 193.

899 F.2d at 209 (holding that a causal connection may be "established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus").

### (a) First ILOD Determination

Plaintiffs argue that both (1) Principal Rojo's comments to Mr. Stylianou and (2) Dr. Erber, Principal Rojo, and Principal Dubin's failure to abide by BOE regulations constitute direct evidence of their retaliatory animus towards Mr. Stylianou. In response, defendants claim that Principal Rojo's statements are merely "stray remarks," which are insufficient to prove discriminatory intent.

Plaintiff has presented evidence that, on two occasions during the fall of 1998, Principal Rojo made statements to Mr. Stylianou indicating that she harbored animus towards employees with disabilities. According to defendants, because Principal Rojo was not the final decision-maker for purposes of Mr. Stylianou's application for ILOD benefits, her comments are insufficient evidence of discriminatory motive underlying the denial of plaintiff's ILOD benefits. (Defs.' Br. at 10.) However, the Second Circuit has held that "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process." *Back*, 365 F.3d at 125 (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999)). In the case of Mr. Stylianou's first application

for ILOD benefits, it is clear from the record that Principal Rojo, although not the final decision-maker, played a "meaningful role" in the ILOD process. Plaintiffs have presented evidence that: (1) Principal Rojo was responsible for providing Mr. Stylianou with the requisite forms, but she failed to do so in a timely manner; (2) Principal Rojo was required to conduct the initial investigation into the incident, and solicited only a single witness statement; and (3) Principal Rojo issued the initial decision to deny Mr. Stylianou's first ILOD application, and added a note on the application that there was a "lack of credible evidence to substantiate ILOD." (Bardavid Decl., Exs. CC, N, DD, F, MM.) This note was visible by those who later evaluated Mr. Stylianou's application, including Superintendent Erber and the Medical Bureau. Moreover, Principal Rojo's actions may have affected the evaluation of Mr. Stylianou's application by Superintendent Erber, who noted the lateness of the ILOD application by circling the date that it was submitted and adding an exclamation point, and who was only able to review one witness statement in making her determination of whether to approve the application.

In addition to Principal Rojo's comments, plaintiffs argue, discriminatory animus is shown by Principal Rojo and Superintendent Erber's failure to follow the procedures for processing ILOD claims as set forth in BOE Special Circular No. 32. Plaintiffs have presented evidence that Principal Rojo declined to provide Mr. Stylianou with the necessary forms within the time frame required by the BOE and did not conduct as thorough an investigation as required by the ILOD regulations. In addition, Superintendent Erber added the notation "disapproved pending medical," a disposition category that does not exist under the BOE's

regulations, on the original ILOD form. Such evidence, particularly when coupled with Principal Rojo's statements, is sufficient to create an inference of discrimination. *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 97 (2d Cir. 1999) (holding that to establish a *prima facie* case of age discrimination, "it is enough for a plaintiff to present evidence that an employer departed from its usual employment practices and procedures in dealing with that particular employee"); *Feldman v. New York Blood Ctr.*, No. 00 Civ. 8795 (LMM), 2002 U.S. Dist. LEXIS 23730, at *19-20 (S.D.N.Y. December 11, 2002) (holding that in the hiring context, deviation from standard hiring practices is sufficient to meet the minimal burden of establishing a *prima facie* case). The Court finds that Mr. Stylianou has set forth a *prima facie* case of retaliation with regard to the first denial of ILOD benefits.

### (b) Second ILOD Determination

Plaintiffs have failed to establish any causal connection between Mr. Stylianou's protected activity and the second ILOD determination based upon direct evidence of discriminatory animus. In this instance, the injury that formed the basis for the application took place at a different school, and Principal Rojo was not involved in any way with the review of Mr. Stylianou's application for benefits. *Boyle v. McCann-Erickson, Inc.*, 949 F. Supp. 1095, 1102 (S.D.N.Y. 1997) (holding that where discriminatory comments were made by supervisors who were not involved in the decision to terminate him, they did not constitute evidence of discrimination). Plaintiffs allege that Superintendent Erber, who was involved in processing both ILOD applications, "harbored discriminatory animus" towards Mr. Stylianou. (Pls.' Br. at 16.) However, evaluating all of the

circumstances, there is no basis for finding retaliatory or discriminatory animus relating to Mr. Stylianou's second ILOD application. Dr. Erber had worked closely with Principal Rojo in the past, but did not have a direct relationship with Mr. Stylianou. Neither she, nor anyone else involved with the second ILOD application is alleged to have made discriminatory remarks towards Mr. Stylianou or against individuals with disabilities generally. In addition, although Superintendent Erber added a notation on Mr. Stylianou's *first* application for ILOD benefits that was not provided for in the BOE regulations, she in fact "approved" his second ILOD application pending a medical evaluation, pursuant to the guidelines set forth in Special Circular 32. Ultimately, the Medical Bureau actually awarded Mr. Stylianou ILOD benefits for six weeks. Therefore, plaintiffs cannot establish directly, through evidence of discriminatory or retaliatory animus, a causal connection between Mr. Stylianou's protected acts and the second ILOD determination.

### (c) Termination of Health Insurance Benefits

Plaintiffs have not presented any evidence that Principal Rojo, or any BOE employee exhibiting discriminatory or retaliatory animus towards Mr. Stylianou, was involved in the termination of plaintiffs' health insurance benefits.[17] In fact, no evidence was presented that Principal Rojo, or anyone

---

[17] Plaintiffs note that Principal Rojo approved Mr. Stylianou's request for medical leave the day after his health care was terminated for the first time. This statement does not provide the Court with any basis to conclude that Ms. Rojo was involved with the termination of plaintiffs' health care benefits.

harboring animus towards Mr. Stylianou played any role whatsoever in controlling plaintiffs' health insurance coverage. *See, e.g., Boyle*, 949 F. Supp. at 1102 (finding that where "most of the statements were made by those not involved in [the adverse employment action]," plaintiff could not rely on such comments as proof of discrimination).

Furthermore, plaintiffs are unable to demonstrate through indirect evidence that a causal connection exists between Mr. Stylianou's protected activity and the second ILOD determination or termination of health benefits. The alleged retaliatory acts did not occur close in time to the protected activity. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'") (internal citations omitted). The second termination of plaintiffs' health benefits, on February 28, 2000, took place nearly seven months after Mr. Stylianou's most recent protected activity, a complaint letter dated July 22, 1999.[18] The September 13, 2000 partial denial of Mr. Stylianou's application for ILOD benefits took place over four months after the most recent protected activity, a complaint letter dated May 1, 2000. In fact, the shortest amount of time between any of Mr. Stylianou's protected activity and the alleged adverse employment action was four months. Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554-55 & 555 n.5 (2d Cir. 2001), "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." *Id*; *Cunningham v. Consol. Edison, Inc.*, No. 03 Civ. 3522 (CPS), 2006 U.S. Dist. LEXIS 22482, at *55-56 (E.D.N.Y. March 28, 2006) (collecting cases). Thus, none of the adverse employment actions alleged follow sufficiently closely in time to Mr. Stylianou's protected activity that an inference of causation is appropriate. Plaintiffs fail to set forth a *prima facie* case of retaliation with regard to the second ILOD decision and the second termination of health coverage.

b. Legitimate, Non-Retaliatory Reasons for Adverse Employment Actions

Defendants contend that, even if plaintiffs are able to set forth a *prima facie* case of retaliation, their showing must be defeated by defendants' legitimate, non-retaliatory reasons for the adverse employment actions. In the case of Mr. Stylianou's first application for ILOD benefits, defendants argue that the decision of the Medical Bureau to deny benefits was based on their own medical examination of the plaintiff, review of his prior medical records, and the witness statement relating to the December 7, 1998 incident. Based upon this information, defendants argue, the Medical Bureau concluded that "[a]t his Medical Bureau evaluations there was no objective evidence to support his claim of disability. In addition his

_____

[18] As previously discussed, as soon as the BOE was apprised of the first termination of health care benefits, plaintiffs coverage was immediately restored retroactive to the termination date; the termination did not constitute an adverse employment action. *See supra*.

long standing and well documented osteoarthritis and history of radiculopathy appear to be the far more likely cause of any pain or disability Mr. Stylianou may have been experiencing." (Bardavid Decl., Ex. M.) Defendants have thus met their burden of showing legitimate, non-retaliatory reasons for the ILOD benefits denials.

### c. Pretext

Once a defendant has met his burden of articulating a legitimate, non-retaliatory reason for the challenged employment decision, "the plaintiff must point to evidence that would be sufficient to permit a rational fact-finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Treglia*, 313 F.3d at 721 (citing *Cifra*, 252 F.3d at 216). Viewing the evidence in the light most favorable to plaintiffs, it appears that in the case of the first ILOD determination, a reasonable jury could conclude that the non-retaliatory reasons given by the BOE were pretextual explanations meant to hide its unlawful motive. The plaintiffs' evidence of discriminatory and retaliatory comments, including Principal Rojo's warning to Mr. Stylianou "you're next," combined with the principal and superintendent's failure to abide by the regulations set forth in Special Circular 32, create a question of material fact as to retaliatory animus. In addition, while defendants suggest that the determination of the Medical Bureau was independent of Principal Rojo and Superintendent Erber's actions, it is also a question of material fact whether retaliatory animus by administrators may have affected the Medical Bureau's conclusions. The record indicates that the Medical Bureau was, in fact, aware of the administrative denial of Mr. Stylianou's first ILOD application. In a summary of the relevant events, which was to be provided to the neutral medical arbitrator, the director of the Medical Bureau noted that "[a]s no report of the accident had been filed until almost a month after its alleged occurrence, the accident was administratively denied as line of duty by the superintendent, who noted that in addition to late filing there was also a lack of credible evidence to substantiate Mr. Stylianou's claim." (Bardavid Decl., Ex. M.) Plaintiff argues that this conclusion was influenced by Principal Rojo's failure to investigate fully, her delay in responding to Mr. Stylianou's requests, and her denial of ILOD benefits, all of which may have been infected by discriminatory animus. If proven, it is certainly possible that against this administrative background, the Medical Bureau's determination of Mr. Stylianou's ILOD status was not completely independent of possible retaliatory bias that affected the processing of his claim.[19]

---

[19] In the case of the second ILOD determination, with which Principal Rojo was not involved, plaintiffs have not made a *prima facie* case of retaliation. Even if this Court were to hold that plaintiffs had sufficient evidence to set forth a prima facie case, plaintiffs cannot show that the decision to award Mr. Stylianou benefits for only six weeks (rather than the amount of time desired by plaintiff) was merely pretextual. The only demonstration of any retaliatory animus relating to the second ILOD determination is the fact that Superintendent Erber, who actually "*approved* [the second ILOD application] subject to medical evaluation," pursuant to BOE rules, had failed to abide by BOE regulations in the case of the *first* ILOD application when she added the note "disapproved pending medical review." (Bardavid Decl., Ex. K.) Moreover, "an employer's failure to follow its own regulations and procedures, alone, may not be sufficient to support the conclusion that its explanation . . . is pretextual." *Bucknell v. Refined Sugars, Inc.*, 82 F. Supp. 2d

Therefore, the Court denies summary judgment as to plaintiffs' claim of retaliation relating to Mr. Stylianou's first application for ILOD benefits. The Court grants defendants' motion for summary judgment as to plaintiffs' claims of retaliation as to the second ILOD decision and both terminations of plaintiffs' health care benefits.

## D. DUE PROCESS

Plaintiffs claim that defendants denied Mr. Stylianou due process of law under the Untied States Constitution, the New York State Constitution and New York State Education Law § 3020 by (1) terminating his health benefits, (2) denying him ILOD benefits and (3) denying him an Accident Disability Pension.[20]

Although plaintiffs bring due process claims under both federal and state law, "[f]ederal constitutional standards rather than state statutes define the requirements of procedural due process." *Verri v. Nanna*, 972 F. Supp. 773, 798 (S.D.N.Y. 1997) (citing *Robison v. Via*, 821 F.2d 913, 922 (2d Cir. 1987)). In general, "the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged." *Logan v. Zimmerman Brush Co.*,

455 U.S. 422, 433 (1982) (finding that "'some form of hearing' is required before the owner is finally deprived of a protected property interest"). When reviewing alleged procedural due process violations, courts must distinguish between "(a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996). The Supreme Court has held that in the case of "random, unauthorized" deprivations by state employees, due process does not require a pre-deprivation hearing; rather, post-deprivation state tort remedies are sufficient. *Parratt v. Taylor*, 451 U.S. 527, 541 (1981). However, the Second Circuit has held that such deprivations, when effected by high-level decision-makers, cannot be considered "random and unauthorized." *Dwyer v. Regan*, 777 F.2d 825, 832 (2d Cir. 1985) (finding that where an employee was arbitrarily terminated by the head of the New York State Employees Retirement System, the employee was entitled to a pre-termination hearing). Plaintiffs argue that Mr. Stylianou was deprived of his property rights by the "established state procedures" of the Board of Education and TRS, or, in the alternative, by the "random, unauthorized" deprivations of "high-level decision-makers." In either case, he argues, he was wrongfully denied access to a pre-deprivation hearing.

### 1. COBRA Benefits

In the case of plaintiffs' COBRA benefits, it is undisputed that when plaintiffs' health benefits were terminated, the benefits either were restored retroactively or plaintiffs were provided with the opportunity to restore their benefits retroactively. "In order for this court to act, plaintiffs 'must have suffered, or be

---

151, 159 (S.D.N.Y. 2000), *aff'd*, 225 F.3d 645 (2d Cir. 2000) (holding that failure to follow rules and regulations did not indicate discriminatory animus where plaintiff had not put forth any evidence of discriminatory comments or poor treatment of protected class of employees).

[20] At the time that plaintiffs' complaint was filed on January 25, 2002, Mr. Stylianou had applied for an Accident Disability Pension, but had not yet been denied.

threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Wooten v. N. Y. City Human Resources Admin.*, 421 F. Supp. 2d 737, 740 (S.D.N.Y. 2006) (citing *In re Kurtzman*, 194 F.3d 54, 58 (2d Cir. 1999)). In *Wooten*, where plaintiff's medical benefits had been terminated, but were restored retroactively, the court held that plaintiff's claims were moot and thus barred from adjudication before an Article III court. *Id.*, 421 F. Supp. at 740 (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998) (holding that to satisfy Article III constitutional requirements, a litigant's injuries must be "concrete and actual and imminent, not conjectural or hypothetical")); *see also Headen v. Sullivan*, No. 91-CV-5817 (KMW), 1992 WL 471168, at *2 (S.D.N.Y. Sept. 8, 1992) ("In a social security action seeking payment of benefits, the actual payment of those benefits generally moots the action. . . . Federal courts lack jurisdiction to hear moot cases because such cases do not meet the 'case or controversy' requirement of Article III of the Constitution."). Here, as in *Wooten*, the Court finds the due process claims moot because, in the case of the first termination, plaintiffs' benefits were actually restored, and in the case of the second termination, plaintiffs were provided with the opportunity to have their health benefits fully restored.

## 2. ILOD Benefits

In the case of plaintiffs' two applications for ILOD benefits, Mr. Stylianou alleges that he was denied due process because various state employees negatively influenced the BOE Medical Bureau's decisions to deny him ILOD benefits on the basis of the December 7, 1998 incident, and to grant in part and deny in part his ILOD application relating to the December 1, 1999 incident. However, Mr. Stylianou was offered the opportunity for review of these decisions by medical arbitration before a neutral examiner, to be mutually agreed upon by the teachers' union and the BOE pursuant to the terms of the CBA. Procedures for the medical arbitration are set forth in the collective bargaining agreement as follows: "[t]he medical arbitrator shall examine the employee, and consult with the employee's physician and the Board's physician. The arbitrator's authority shall be limited to determining the medical aspects of the employee's claim." (Bardavid Decl., Ex. R.) These procedures meet the basic "notice" and "hearing" due process requirements of the law. *See McDarby v. Dinkins*, 907 F.2d 1334, 1337 (2d Cir. 1990) (finding that where medical board determining eligibility for disability pension examined plaintiff, evaluated submissions on his behalf, reviewed his medical records and reconsidered the original adverse determination against him, "[d]ue process requires no more"); *Basciano v. Herkimer*, 605 F.2d 605, 611 (2d Cir. 1978) (holding that due process did not require trial-type hearing in determination of city employee's eligibility for disability pension). Although Mr. Stylianou was given the chance to have his ILOD decisions reconsidered in a medical arbitration, he refused to participate in this process. Plaintiffs cannot now claim that Mr. Stylianou was denied a full and fair opportunity to protect his rights. "Plaintiff cannot recover on a due process claim if the process was available and he simply failed to avail himself of it." *Wooten*, 421 F. Supp. 2d at 741.

## 3. Accident Disability Pension

On November 29, 2001, Mr. Stylianou applied for an Accident Disability Pension

with the TRS. His initial appointment, scheduled for January 9, 2002, was cancelled by TRS and rescheduled for January 30, 2002. Shortly after the appointment was cancelled, Mr. Stylianou amended his complaint for relief in this action to include the TRS. At the time that the complaint was filed, Mr. Stylianou did not have a valid due process claim on the basis of the procedures relating to his Accident Disability Pension, as he had not exhausted the available procedures. While this lawsuit was pending, Mr. Stylianou was evaluated by a TRS doctor, and his application for an Accident Disability Pension was denied. Even if Mr. Stylianou were given the opportunity to submit a new complaint in this action, this Court would find that the procedures afforded to Mr. Stylianou for adjudication of his Accident Disability Pension request meet the requirements of due process. *See McDarby*, 907 F.2d at 1337; *Basciano*, 605 F.2d at 611. Furthermore, Mr. Stylianou could have brought a proceeding under Article 78 of the New York Civil Practice Law & Rules.[21] N.Y. C.P.L.R. §§ 7801-7806. Mr. Stylianou has not been deprived of "a meaningful opportunity to be heard," under the due process clause. *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971).

Therefore, the Court grants defendant's motion for summary judgment as to all of plaintiffs' due process claims.

E. COBRA

Plaintiff also asserts a COBRA claim alleging that defendants intentionally terminated his health insurance without just cause and without notice on two occasions. Defendants contend that plaintiffs cannot establish that they suffered actual economic damages, and therefore are not entitled to relief under COBRA.[22]

The purpose of COBRA is to allow employees who lose their jobs to continue their medical coverage at approximately the group rate, which is lower than the rate for individual coverage. *See Local 217, Hotel & Restaurant Employees Union v. MHM*, 976 F.2d 805, 809 (2d Cir. 1992). The statute requires that a group health plan must provide qualified beneficiaries of a health plan who are facing a "qualifying event" (*i.e.*, termination) the opportunity to elect continuing coverage under the plan. 29 U.S.C. § 1161(a). The notice requirements of COBRA provide that when an employee is terminated or begins to work reduced hours such that his or her health care coverage would ordinarily be terminated, the employer must notify the health care plan administrator within 30 days (or, in the case of a group health plan which is a multiemployer plan, such longer period of time as may be provided in the terms of the plan) that a "qualifying event" has occurred. 29 U.S.C. § 1163(a)(2). In turn, the administrator must notify any "qualified beneficiary" of such plan within fourteen days (or, in the case of a group health plan which is a multiemployer plan, such longer period of time as may be provided in

---

[21] Although Mr. Stylianou is now barred from instituting an Article 78 proceeding, he cannot claim a due process violation on this basis, as such a proceeding is not required to afford him due process, and he had ample time in which to pursue Article 78 relief. *McDarby*, 907 F.2d at 1338, 1338 n.3.

[22] COBRA has been codified as part of ERISA. *See* 29 U.S.C. §§ 1001-3007; *Phillips v. Saratoga Harness Racing, Inc.*, 240 F.3d 174, 177 n.1 (2d Cir. 2001).

the terms of the plan). 29 U.S.C. § 1163(c). The beneficiary may elect to continue their health plan coverage within sixty days of the qualifying event or notice of the qualifying event (whichever is later). 29 U.S.C. § 1165(1). Premiums must be paid by the employee, and the coverage extends for a maximum of eighteen months. 29 U.S.C. § 1162.

It is undisputed that plaintiffs did not receive timely notice under the COBRA statute prior to termination of their benefits. A plan administrator's failure to comply with COBRA's notice requirements may entitle a beneficiary to statutory damages of up to $100 per day, attorney's fees and costs, and medical damages.[23] 29 U.S.C. § 1132(c)(1); Section 1132(g)(1); *Gigliotti v. Sprint Spectrum, L.P.*, No. 00 Civ. 217 (FJS), 2001 U.S. Dist. LEXIS 20221, at *19-20 (N.D.N.Y. December 7, 2001) (permitting damages for the medical costs plaintiffs incurred due to the termination of coverage); *DeNicola v. Adelphi Academy*, No. 05 Civ. 4231, 2006 U.S. Dist. LEXIS 73301, at *29-30 (E.D.N.Y. September 29, 2006) (same). Both the decision to award penalties and the amount of any award, as well as the granting of attorneys' fees and costs or medical damages, are within the discretion of the trial court. 29 U.S.C. § 1132(c)(1); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 90 (2d. Cir. 2001) (assessing statutory penalties); *Kascewicz*, 837 F. Supp. at 1324 (declining to award attorneys' fees "[i]n light of the Court's assessment of penalties"); *DeNicola*, 2006 U.S. Dist. LEXIS 73301, at *33-35 (denying

attorneys' fees); *Gigliotti*, 2001 U.S. Dist. LEXIS 20221, at *18-20 (declining to award attorneys' fees or statutory penalties, but granting medical damages).

In the instant case, plaintiffs seek attorneys' fees and out of pocket medical expenses incurred during the loss of coverage. In support of the claim for medical expenses, plaintiffs have submitted documentation supporting such expenses. Defendants cite *Partridge v. HIP of Greater New York*, No. 97 Civ. 0453 (JSM), 2000 U.S. Dist. LEXIS 8714, *17 (S.D.N.Y. June 26, 2000), for the proposition that plaintiffs' COBRA claim must fail on the basis that they did not suffer actual economic damages. (Defs.' Br., at 26.) However, this conclusion is not supported by the plain language of the COBRA statute or the case law. *Partridge* did not deny the plaintiff COBRA relief based upon a lack of "actual economic damages" *per se*; rather, it was because when the plaintiff's health care was terminated, she was immediately covered under another plan, and therefore "suffered no prejudice or injury from the alleged failure to notify." *Partridge*, 2000 U.S. Dist. LEXIS 8714, at *17. By contrast, the plaintiffs in the instant case were completely without coverage for nearly one year before they were provided with the opportunity to elect retroactive coverage. (*See* Bardavid Decl., Ex. W.) Under these circumstances, the Court concludes that it cannot dismiss the COBRA claim as a matter of law for a "lack of actual economic damages." Therefore, summary judgment as to plaintiffs' COBRA claims is denied.

---

[23] ERISA penalties were increased to a maximum of $110 per diem, pursuant to the Federal Civil Penalties Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996. *See* 29 C.F.R. 2575.502c-1.

### F. State Claims

#### 1. Intentional Infliction of Emotional Distress

In order to assert a valid claim for intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must demonstrate (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Id.* The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Martin v. Citibank*, N.A., 762 F.2d 212, 220 (2d Cir. 1985) (citing *Fischer v. Maloney*, 43 N.Y.2d 553, 558 (N.Y. 1978)).

This Court has held that "[i]n the employment context, conduct rarely meets the strict standard for IIED without some combination of public humiliation, false accusations of criminal or heinous conduct, verbal threats, permanent loss of employment, or conduct contrary to public policy." *Valenti v. Massapequa Union Free Sch. Dist.*, No. 03 Civ. 1193 (JFB), 2006 U.S. Dist. LEXIS 62899, at *46 (E.D.N.Y. September 5, 2006). Such is not the case here, where plaintiffs have not presented evidence of outrageous conduct approaching the IIED standard. In the absence of "sufficiently outrageous" conduct, no claim for IIED can be established. As no reasonable juror could find in favor of plaintiffs on their IIED claim, summary judgment is granted in favor of defendants.

#### 2. Constructive Discharge

Plaintiff argues that defendants constructively discharged him in a discriminatory manner "by acting as though Plaintiff Stylianou was fit for duty and is able to return to work" when they informed Stylianou, who had been out of work for six months, that if he did not either take a leave of absence or retire, his employment with the BOE would be terminated. (Second Am. Compl., ¶ 142.) Under New York law, "constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d Cir. 2000); *see Rosario v. National Hous. Pshp. Prop. Mgmt.*, No. 96 Civ. 4633 (BSJ), 1998 U.S. Dist. LEXIS 3692, at *13-14 (S.D.N.Y. Mar. 24, 1998) ("Because the 'bulk of the cases addressing constructive discharge . . . are federal cases,' New York State Courts look to 'federal authority . . . in determining whether a plaintiff has stated a cause of action for constructive discharge.'") (citations omitted). "To find that an employee's resignation amounted to a constructive discharge, the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987).

The facts alleged by plaintiffs simply do not conform to the paradigm of a constructive discharge case; Mr. Stylianou voluntarily absented himself from work for six months without filing a medical leave of absence, and was not subject to any "working conditions" or "work atmosphere" whatsoever. There is

simply no basis for the proposition that an employee who fails to work for six months without leave is "constructively discharged" when his employer prompts him to file a formal leave of absence or to retire. Because no trier of fact could find in favor of plaintiffs on their constructive discharge claim, summary judgment is granted in favor of defendants.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby

ORDERS that plaintiffs' motion to strike is DENIED; and the Court further

ORDERS that defendants' motion for summary judgment is GRANTED with respect to the discrimination, due process, IIED and constructive discharge claims; and the Court further

ORDERS that defendants' motion for summary judgment is GRANTED with respect to the retaliation claims, except as to the claim arising from the *first* ILOD determination; and the Court further

ORDERS that defendants' motion for summary judgment is DENIED with respect to the COBRA claim.


SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated: January 16, 2007
Central Islip, New York

* * *

The attorneys for plaintiffs are Jo Anne Simon and Rochelle Prashker, Esqs., Law Office of Jo Anne Simon, 356 Fulton Street, 3rd Floor, Brooklyn, New York 11201, Jonathan A. Bernstein, Esq., Levy Davis & Maher LLP, 880 Third Avenue, Ninth Floor, New York, New York, 10022-4730. The attorneys for defendants are Cindy E. Switzer, Holly Rahel Gerstenfeld and Jonathan Michael Bardavid, Esqs., City of New York Law Department, 100 Church Street, New York, New York 10007.